IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PHL VARIABLE INSURANCE COMPANY, | ) |
| Plaintiff, | ) |
| v. | ) C.A. No. 12-319 |
| ESF QIF TRUST, by and through its trustee, DEUTSCHE BANK TRUST COMPANY, | ) |
| Defendant. | ) |

## COMPLAINT

Plaintiff PHL Variable Insurance Company ("Phoenix"), by and through its attorneys, files this Complaint against the ESF QIF Trust ("ESF Trust"), by and through its trustee, Deutsche Bank Trust Company ("Deutsche Bank"), as follows:

1. This is an action for Declaratory Judgment under 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure. Phoenix seeks to adjudicate its rights and obligations under a policy of life insurance bearing the number 97519312 (the "Policy") insuring the life of Roberta Griggs ("Mrs. Griggs"), who is now deceased. Specifically, Phoenix seeks a declaration that the Policy is null and void *ab initio* due to the lack of an insurable interest at the Policy's issuance.

2. As explained in greater detail below, Mrs. Griggs, with the assistance of others, executed a plan, scheme and/or design intended to procure a life insurance policy on Mrs. Griggs's life for the purpose of selling it on the secondary market. In applying to Phoenix for this insurance, Mrs. Griggs and the Roberta Griggs Insurance Trust III ("Griggs Trust"), by and through its trustee, Jonathan Berck ("Mr. Berck") made numerous misrepresentations concerning Mrs. Griggs's net worth and income, bona fide need for the insurance sought, funding source of policy premiums, and whether third-party investors would obtain any rights or interest in the

applied-for policy. Additionally, the Griggs Trust was created in order to disguise the illicit nature of this transaction and create the false perception that the Policy was purchased for legitimate estate planning purposes. The Policy however, was not sought by Mrs. Griggs to meet her estate planning needs, but instead was sought by, and intended for the benefit of, investors who were complete strangers to Mrs. Griggs and who lacked a legally cognizable insurable interest in her life.

3. Because the Policy lacked an insurable interest at its inception, it is null and void *ab initio*, and no death benefits are payable under the Policy. As such, there is an actual controversy of a justiciable nature concerning the rights and obligations of the parties under the Policy.

## THE PARTIES

4. PHL Variable Insurance Company is a Connecticut insurance company authorized to transact the business of insurance in Delaware. Phoenix is organized under the laws of Connecticut with its principal place of business in Hartford, Connecticut. Phoenix's headquarters are located at One American Row, Hartford, Connecticut 06102–5056. Phoenix's high level officers direct, control and coordinate the corporation's activities from Hartford, Connecticut. As such, Phoenix is a citizen of the State of Connecticut within the meaning and intent of 28 U.S.C. § 1332.

5. The ESF QIF Trust is a Delaware statutory trust formed pursuant to the Delaware Statutory Trust Act, 12 Del. C. §§ 3801, *et seq.* and is a citizen of Delaware within the meaning and intent of 28 U.S.C. § 1332. The trust may be served through its trustee, Deutsche Bank Trust Company, at 1011 Centre Road, Suite 200, Wilmington, Delaware 19805.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over all parties of this lawsuit under 28 U.S.C. § 1332(a)(1) because Phoenix and the ESF Trust are citizens of different states, and the amount in controversy exceeds $75,000, exclusive of attorneys' fees, interest and costs. The ESF Trust and its trustee are subject to the personal jurisdiction of this Court.

7. This Court has jurisdiction for the declaratory judgment action pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. §§ 2201 and 2202, which grant the United States District Courts jurisdiction to declare the "rights and other legal relations of any interested party making such declaration, whether or not further relief is or could be sought."

8. Venue is proper in this district pursuant to 28 U.S.C. § 1391(a), because the ESF Trust resides in this District and all or a substantial portion of the events or omissions giving rise to the cause asserted herein took place in the State of Delaware. Additionally, the Policy was issued in Delaware and is governed by Delaware law.

## FACTUAL BACKGROUND

### A. Stranger Originated Life Insurance

9. In recent years, a derivative market for life insurance has developed in which existing life insurance policies and certificates are sold to third parties who lack an insurable interest in the life of the insured. Typically referred to as a "life settlement", these sales are generally lawful, assuming that the policy was procured for legitimate purposes and that there was an insurable interest at the policy's inception.

10. As this derivative market has developed however, there has been a proliferation of life insurance policies that are not sought for legitimate insurance needs, but rather for re-sale to strangers in the secondary market. Policies procured under these circumstances have become

known as stranger originated life insurance ("STOLI") policies. STOLI policies are illegal wagering contracts that lack an insurable interest at inception. As such, STOLI policies are void *ab initio*.

11.     Although the STOLI market has only recently come into existence, the underlying concept has persisted for over a century. Indeed, in the late nineteenth and early twentieth centuries, both the Delaware Supreme Court and the United States Supreme Court opined against unlawful "wagering contracts," and the "sinister counter interest" in the death of the insured that results from the issuance of such policies.[1] In an effort to prevent investors from speculating on the lives of others, many states have enacted insurable interest laws to protect the integrity of life insurance by requiring that a policy owner have a cognizable interest in the longevity of the insured at the time the policy is issued. However, STOLI promoters have attempted to circumvent these laws by carefully constructing their transactions to hide the fact that the policies are not being procured to satisfy legitimate insurance needs, but instead are being procured as impermissible wagers.

---

[1] *See Grisby v. Russell*, 222 U.S. 149, 154–55 (1911) (explaining that an insurance policy lacking an insurable interest at inception merely serves as a cover for a "pure wager," which contradicts the precise purpose of a life insurance policy because it "gives the [policyholder] a sinister counter interest in having the insured's life come to an end."); *Warnock v. Davis*, 104 U.S. 775, 779 (1881) (condemning wagering contracts because they "have a tendency to create a desire for the [death of the insured] and are, therefore, independently of any statute on the subject, condemned, as being against public policy."); *see also Baltimore Life Ins. Co. v. Floyd*, 91 A. 653, 656 (Del. 1914) ("Insurance procured upon a life by one or in favor of one under circumstances of speculation or hazard amounts to a wager contract and is therefore void."). Indeed, the Delaware Supreme Court recently reaffirmed Delaware's longstanding prohibition against wagering contracts lacking an insurable interest. *See PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Trust, ex rel. Christiana Bank & Trust Co.*, 28 A.3d 1059, 1067–1068 (Del. 2011) ("Under Delaware common law, if a life insurance policy lacks an insurable interest at inception, it is void *ab initio* because it violates Delaware's clear public policy against wagering.").

12.     In order to maximize their potential return on investment, STOLI promoters will seek out individuals aged seventy years or older who are purportedly financially qualified for high face amount insurance policies. This in turn allows STOLI promoters to multi-million dollar life insurance policies on individuals who, actuarially speaking, are expected to have a relatively limited lifespan. The perverse result is that the shorter life expectancy of these individuals makes them a more attractive investment to those who would gamble on the lives of these insureds.

13.     In many cases, STOLI policies are initiated with fraudulent representations during the application for insurance. Insurers will not issue coverage unless there is a legitimate need for the insurance applied for, such as estate conservation or income replacement. As such, insurers, in an effort to prevent issuing STOLI policies, require insurance applicants to respond to specific questions during the application process regarding the insured's net worth and income, the purpose of the insurance sought, any intent to transfer the policy, and the funding source of policy premiums. STOLI promoters and insureds will falsely answer these questions in order to obtain the insurance sought. Additionally, in order to maximize their profit and/or to obtain high-face amount policies insuring individuals not qualified for such policies, STOLI promoters and insureds frequently provide insurers with false information regarding an insured's financial status.

14.     In furtherance of a STOLI scheme, the Griggs Trust procured the Policy from Phoenix. In doing so, STOLI promoters caused the establishment of the Griggs Trust to give the false appearance that the Policy was being purchased for legitimate estate planning purposes. In fact, the Griggs Trust was created to act as a vehicle to circumvent applicable insurable interest laws so that the Policy could be controlled by a third-party investor that lacked an insurable

interest in Mrs. Griggs's life. Additionally, the Trust and Mrs. Griggs made numerous fraudulent misrepresentations relating to Mrs. Griggs's net worth and annual income, bona fide insurance need for the Policy, the funding source of the Policy premiums and the intent for investors to obtain an interest in the Policy.

15. Because the Policy was fraudulently procured as a mere cover for an impermissible wagering contract, the Policy lacked a valid insurable interest at its inception and is therefore void.

16. Had Phoenix known of the true facts concerning the application, it would not have issued the Policy.

17. As such, Phoenix brings this action for an order declaring the Policy null and void *ab initio*.

B. **The Procurement of the Griggs Policy**

i. **The Application for the Policy**

18. Phoenix is, and during all relevant times has been, in the business of underwriting and issuing policies of life insurance and is authorized to transact the business of insurance in the State of Delaware.

19. On or about October 17, 2006, Phoenix received an application form and related documents seeking the issuance of an insurance policy with a $10 million face amount insuring Mrs. Griggs's life. The application form represented that the Griggs Trust, which was created on October 9, 2006, was the proposed owner and sole beneficiary of the applied-for policy. The Trust, by and through its trustee, Mr. Berck, executed the application form as the policy owner.

20. In applying for the Policy, Mrs. Griggs and the Griggs Trust provided Phoenix with material information regarding, among other things, Mrs. Griggs's net worth and income,

the financing of premiums, and whether there was any intention that a third-party would obtain an interest in the applied-for policy. In applying for the Policy, Mrs. Griggs and the Griggs Trust knew that they were required to provide complete, accurate and honest answers to the questions presented by Phoenix. Mrs. Griggs and the Griggs Trust also knew that Phoenix would rely upon the answers given in determining whether Mrs. Griggs was insurable and qualified for the insurance sought through the application.

21. Mrs. Griggs and the Griggs Trust, through its trustee, Mr. Berck, responded to clear, direct questions seeking material information regarding Mrs. Griggs's net worth and annual income. In response to these questions, it was represented that Mrs. Griggs had a net worth of over $60 million and unearned income of over $1 million. Additionally, the application form represented that there was no intention that any third-party would obtain any right, title or interest in the applied-for policy and that there would be no financing method utilized to pay the premiums in order to facilitate a current or future transfer or assignment with respect to the benefits of the applied-for policy. As discussed more fully in the ensuing paragraphs, these representations were false, were material to Phoenix's acceptance of the risk assumed, and were made with the intent that Phoenix rely upon them in issuing the Policy.

22. The application form contained the following affirmation:

> I have reviewed this application, and the statements made herein are those of the proposed insured and all such statements made by the proposed insured in Part I or and in Part II of this application are full, complete, and true to the best knowledge and belief of the undersigned and have been correctly recorded.

Mrs. Griggs and the Griggs Trust, through its trustee, Mr. Berck, executed the application form on or about October 13, 2006 and October 16, 2006, respectively. The application form represented that Mrs. Griggs signed the application form in the state of Minnesota and that Mr. Berck, on behalf of the Trust, signed the application form in the state of Delaware.

23. Along with the application form, Mrs. Griggs and the Griggs Trust, through its trustee Mr. Berck, executed a Statement of Client Intent Form (the "SOCI"), which requested material information regarding, among other things, the purpose of the insurance, the source of funding for Policy premiums, whether there was any intent or understanding that a third-party would obtain an interest in the Policy and whether the insured or any related parties would receive any inducements in connection with the purchase of the Policy. In response to the SOCI questions, Mrs. Griggs and the Griggs Trust represented that the Policy was sought for "estate planning" purposes, that premiums would not be financed, that the Policy was not being purchased in connection with a program under which the trust or Mrs. Griggs had been advised of the opportunity to transfer the Policy, that there was no intent, understanding or agreement that the Policy would be sold and/or transferred to a third-party, and that neither Mrs. Griggs nor the Trust was being paid cash or other inducement in connection with the application for the Policy. These representations were false, were material to the risk Phoenix assumed, and were made with the intent that Phoenix rely upon them when issuing the Policy.

24. The SOCI contained the following affirmation:

> By signing below, I declare that the statements made are complete and true to the best of my knowledge.

Mrs. Griggs executed the SOCI on or about October 13, 2006 and the Griggs Trust, through its trustee Mr. Berck, executed the same document on or about October 16, 2006.

### ii. The Issuance of the Griggs Policy

25. On the basis of the statements and representations made during the application process, and in reliance upon Mrs. Griggs and the Griggs Trust's complete candor, honesty and openness in disclosing information in response to the questions presented, Phoenix offered the

Policy to the Griggs Trust, with a planned first year premium of $550,000, a policy date of October 26, 2006, and face amount of $10,000,000. The Policy is governed by Delaware law.

26. In order to place the Policy in force, Phoenix required that it receive an executed policy acceptance form and payment of premium. On or about November 2, 2006, Mrs. Griggs and the Griggs Trust, through its trustee, executed the policy acceptance form which represented it had been signed in Delaware. Phoenix subsequently received payment of premiums.

### iii. The Transfer of the Griggs Policy and Death Claim

27. On or about February 5, 2010, the ownership of the Policy was formally transferred to Villa Capital, LLC. On or about March 14, 2011, ownership of the Policy was formally transferred to ESF QIF Trust.

28. Mrs. Griggs passed away on October 14, 2011. On November 18, 2011, Phoenix received a copy of her death certificate and a claim form for benefits from ESF QIF Trust, by and through its trustee Deutsche Bank Trust Company.

### C. Phoenix's Investigation of the Griggs Policy

29. Upon investigation, Phoenix learned that the representations made during the application process concerning Mrs. Griggs's net worth, income, the purpose of the insurance, and whether there was any intent, understanding or agreement that a third-party would obtain an interest in the Policy were each false. Mrs. Griggs and the Griggs Trust knew that said representations were false, and intended that Phoenix rely on these false representations when issuing the Policy.

30. Contrary to the representations made during the application process, Mrs. Griggs did not have a net worth of $60 million or income of $1 million. Mrs. Griggs and the Griggs Trust knew that Mrs. Griggs did not have a net worth of $60 million or income of $1 million at

the time they applied for the policy, but falsely made these representations to Phoenix in order to obtain a life insurance policy for which Mrs. Griggs was not qualified.

31. Without assets approaching the value described to Phoenix, Mrs. Griggs could not afford the $550,000 first year premium payment scheduled for the Policy. Upon information and belief, Mrs. Griggs did not fund payment of the premiums on the Policy. Further, upon information and belief, Mrs. Griggs and the Griggs Trust knew that Mrs. Griggs would not be the funding source for the Policy premiums, and that the premiums would in fact be funded by a third-party investor without an insurable interest in Mrs. Griggs's life. However, Mrs. Griggs and the Griggs Trust made false representations to Phoenix in order to disguise the fact that the premiums would be paid by a third-party investor who lacked an insurable interest in Mrs. Griggs's life.

32. Upon information and belief, Mrs. Griggs and the Griggs Trust intended to immediately sell the Policy to a third-party investor. Mrs. Griggs and the Griggs Trust made false representations to the contrary in order to obtain the Policy.

33. Upon information and belief, Mrs. Griggs and the Griggs Trust knew that there was an understanding or agreement that a party other than the Griggs Trust would obtain a legal or equitable right, title or interest in the Policy. Mrs. Griggs and the Griggs Trust made false representations to the contrary in order to obtain the Policy.

34. Upon information and belief, Mrs. Griggs and the Griggs Trust knew that Mrs. Griggs or a related party or entity would receive cash or other inducement in connection with the application for and purchase of the Policy. Mrs. Griggs and the Griggs Trust made false representations to the contrary in order to obtain the Policy.

35. Upon information and belief, Mrs. Griggs and the Griggs Trust knew that the Policy was being purchased with the intent that a third-party investor, which lacked an insurable interest in Mrs. Griggs's life, would obtain an interest in and control over the Policy. Mrs. Griggs and the Griggs Trust made false representations to the contrary in order to obtain the Policy.

36. Had Mrs. Griggs and the Griggs Trust provided Phoenix with accurate information regarding these items during the application process, Phoenix would not have issued the Policy.

37. Phoenix has suffered damages as a result of the Griggs Trust's misrepresentations and fraud, including compensation paid to insurance brokers, internal costs incurred in placing, administering and servicing the Policy, and costs incurred in investigating and seeking a declaration that the Policy is void.

38. Phoenix brings this action seeking an order that the Policy is null and void *ab initio*.

## DECLARATORY JUDGMENT – LACK OF INSURABLE INTEREST

39. Phoenix incorporates herein by reference each of its allegations contained in Paragraphs 1–38 above.

40. Pursuant to the Federal Declaratory Judgment Statute, 28 U.S.C. § 2201, Phoenix seeks a declaratory judgment that the Policy is null and void *ab initio* due to the lack of an insurable interest and as an illegal wagering contract. The Policy was purchased with the intent to benefit a third party investor, which lacked the requisite insurable interest in Mrs. Griggs's life at the time of the Policy's issuance. The Policy's issuance violates the letter and spirit of Delaware's insurable interest laws and is inconsistent with the state's public policy of prohibiting

wagering on the lives of others. The application for and purported ownership of the Policy by the Griggs Trust was merely a sham transaction intended to circumvent applicable insurable interest laws and public policy. The Policy is, therefore, null and void *ab initio* and is of no force and effect from its inception.

41. Phoenix hereby fully and unconditionally tenders the Policy's premiums to the Court's registry.

42. Notwithstanding paragraph 41, Phoenix seeks an order that it may retain all premiums paid on the Policy.

WHEREFORE, Phoenix demands judgment against the ESF QIF Trust, by and through its trustee, Deutsche Bank Trust Company, as follows:

    a.    An order declaring and adjudging the Policy of life insurance bearing Policy Number 97519312 to be null and void *ab initio*;

    b.    an order that Phoenix deposit with the Clerk of the Court all premiums paid on the Policy along with the required interest, if any;

    c.    an order that the Clerk of Court return to Phoenix all of the premiums deposited with the Court or, alternatively, an order that the Clerk of the Court pay to Phoenix from the premiums deposited an amount equal to: 1) the compensation paid by Phoenix to any brokers arising out of or relating to the sale of the Policy; and 2) any damages incurred by Phoenix as a result of the Policy's issuance and subsequent investigation, including attorneys' fees and expenses;

    d.    reasonable and necessary attorneys' fees and other costs incurred in this action;

  e.  pre-judgment and post-judgment interest at the maximum lawful rate;

  f.  costs of court; and

  g.  such other and further relief as the Court deems equitable and just to Phoenix.

Dated: March 15, 2012

                 /s/ Joseph J. Bellew
                 Joseph J. Bellew (No. 4816)
                 COZEN O'CONNOR
                 1201 N. Market Street, Suite 1400
                 Wilmington, DE 19801
                 Telephone: (302) 295-2000
                 Facsimile: (302) 295-2013
                 Email: jbellew@cozen.com

                 *Attorneys for Plaintiff*
                 *PHL Variable Insurance Company*

*Of Counsel*:
Thomas F.A. Hetherington, Esq.
Jarrett E. Ganer, Esq.
EDISON, McDOWELL & HETHERINGTON LLP
Phoenix Tower
3200 Southwest Freeway, Suite 2100
Houston, TX 77027
Telephone: (713) 337-5580